## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NURY TURKEL, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Case No.: _____ |
| | ) | |
| UYGHUR HUMAN RIGHTS PROJECT, | ) | JURY TRIAL DEMANDED |
| | ) | |
| *Defendant* | ) | |

### COMPLAINT FOR BREACH OF CONTRACT AND DEFAMATION

Plaintiff Nury Turkel ("Mr. Turkel") brings this lawsuit against the Defendant, the Uyghur Human Rights Project ("UHRP" or "Defendant"), for Breach of Contract and Defamation.

### INTRODUCTION

1. This is an action arising from UHRP's inexcusable decision to breach the clear terms of a contract with Mr. Turkel and perpetuate harmful falsehoods—defamatory lies—relating to disproven allegations of sexual harassment made against Mr. Turkel.

2. In short, UHRP signed an agreement with Mr. Turkel to remove from its website and social media pages its wrongful insinuations of sexual harassment by Mr. Turkel—false implications for which UHRP knew there was no basis in fact—and to remedy those wrongful and defamatory publications by issuing a clarifying statement to its listserv. But UHRP deliberately and willfully violated that agreement, opting instead to continue defaming Mr. Turkel by falsely portraying him as a perpetrator of sexual harassment.

3.  UHRP's wrongful actions have caused Mr. Turkel reputational, economic, and emotional harm that continues to the present day.

## PARTIES

4.  Plaintiff Nury Turkel is a United States Citizen of Uyghur descent who lives in Alexandria, Virginia.  Uyghurs are a predominantly Muslim Turkic ethnic group located primarily in Central Asia.

5.  Mr. Turkel is a globally recognized human rights leader and the first U.S.-educated Uyghur lawyer, whose career has been defined by his unwavering commitment to justice and accountability, shaped by his painful experiences in China.

6.  Mr. Turkel was born in a Chinese "reeducation camp" during the height of China's notorious Cultural Revolution.  He spent the first seven months of his life in the prison camp with his mother before they were released in 1971.

7.  When Mr. Turkel was about 28 years old he was granted political asylum by the U.S. government.  He then pursued his legal education and went on to become a distinguished attorney, thought leader, and human rights advocate, with his reputation for professionalism playing a critical role in his success.  Mr. Turkel earned a stellar reputation over the years, built through immense personal and professional sacrifice.

8.  In 2020, Mr. Turkel became the first American of Uyghur heritage to serve on the United States Commission on International Religious Freedom ("USCIRF"), a role he held for four years following his appointment by then-Speaker of the House Nancy Pelosi.  He served as Vice Chair of USCIRF from 2021-2022 and as Chair from 2022-2023.  In these roles, Mr. Turkel championed human rights and religious freedom on the global stage, advocating for oppressed communities and shining a light on injustice, all on behalf of the U.S. government.

9. Mr. Turkel is the author of the award-winning book *No Escape: The True Story of China's Genocide of the Uyghurs*, which includes his personal account of the Chinese government's persecution of the Uyghur people, including his family.  In his book, Mr. Turkel exposes mass atrocities, including forced labor practices, religious oppression, forced sterilization, and advanced surveillance that has turned the Uyghur region into a dystopian police state.  Mr. Turkel's book was the first major work to reveal these abuses committed against the Uyghur people in China.  The book earned critical acclaim for its fearless exploration of one of today's most pressing human rights crises.

10. Mr. Turkel's tireless work and advocacy for a global response to injustices suffered by Uyghurs has garnered recognition from leading institutions, including being named one of TIME's 100 Most Influential People and Fortune Magazine's 50 Greatest Leaders.  He has received prestigious awards such as the Global Soul Award from the Jewish World Watch and the Religious Liberty Prize from Notre Dame Law School.

11. As a thought leader and policy expert, Mr. Turkel has brought global attention to the atrocities committed by the Chinese government against Uyghurs, which two successive U.S. administrations have formally recognized as genocide and crimes against humanity.  He played a pivotal role in advocating for this and other policy responses by the U.S. government and like-minded governments around the world, including bipartisan passage of the Uyghur Human Rights Policy Act and the Uyghur Forced Labor Prevention Act.  Mr. Turkel remains a leading voice in the global fight against human rights abuses and mass atrocities.  Mr. Turkel's lifelong dedication to global humanitarian and human rights causes and service in the U.S. government led to his sanctioning by China and Russia in 2021 and 2022.  This stands as a testament to the impact of his work in defending human rights and advocating for global justice.

12. The Defendant, the Uyghur Human Rights Project, is a non-profit, non-governmental organization located in Washington, D.C.  It describes itself on its website as "promot[ing] the rights of the Uyghurs and other Turkic Muslim peoples in East Turkistan."  UHRP regularly issues reports and briefings to a multitude of international media outlets including *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *Radio Free Asia*, the BBC, Al Jazeera, the Associated Press, Reuters, and more.

13. Mr. Turkel co-founded the Uyghur Human Rights Project in 2004 with a mission to focus on research and documentation of the Chinese government's human rights abuses against the Uyghur people.

14. From 2004 to 2006, Mr. Turkel served as UHRP's inaugural Executive Director, and from 2017 until his voluntary resignation in 2024, he was Chair of UHRP's Board of Directors. Throughout his years of volunteer service, Mr. Turkel played a pivotal role in elevating the profile of the Uyghur people and the UHRP, strengthening the organization's credibility, recognition, and financial stability.  Mr. Turkel represented UHRP in domestic and international media, key congressional hearings, and high-level policy forums, emerging as a leading global voice for Uyghur rights.  Under Mr. Turkel's leadership and through the collective efforts of the management and staff team, the UHRP's work garnered significant recognition, including a nomination by Congress for the 2022 Nobel Peace Prize.

**JURISDICTION AND VENUE**

15. Pursuant to 28 U.S.C. § 1332, the United States District Court for the District of Columbia is the proper jurisdiction for this action because Plaintiff Nury Turkel is a resident of Virginia and Defendant is a 501(c)(3) non-profit organization located in the District of Columbia, and the amount in controversy is more than $75,000.

16. Pursuant to 28 U.S.C. § 1391, the District of Columbia is the appropriate venue for this action because Defendant UHRP resides in the District of Columbia and because a substantial part of the events giving rise to the claims occurred in the District of Columbia.

## FACTS

### A. UHRP Publishes Defamatory Statements Falsely Implying That Mr. Turkel Committed Sexual Harassment and/or Violence Against Women

17. In or around August 2023, one of UHRP's contractors alleged to UHRP that, according to her, some other women had concerns about Mr. Turkel's conduct toward them, which they alleged constituted sexual harassment and that Mr. Turkel had been "blacklisted" by the Human Rights Foundation due to similar allegations.

18. In or around November 2023, the UHRP management hired the law firm Isler Dare, P.C. ("Isler Dare") to conduct an independent investigation into these allegations of sexual harassment against Mr. Turkel. Mr. Turkel denied each and every one of these allegations, and he welcomed the investigation because he knew that he had done nothing wrong. He endorsed the initiative, actively participated in the investigation, and had four separate interviews with the investigators.

19. During its investigation, Isler Dare interviewed 13 witnesses, including the contractor who originally reported the allegations to UHRP; a woman who claimed Mr. Turkel tried to kiss her; UHRP management; several senior staff from the Human Rights Foundation; and Mr. Turkel himself.

20. On April 29, 2024, Isler Dare issued an 8-page report ("the Report") concluding: **"[T]here was no credible factual testimony received to support the overriding allegation that Mr. Turkel has acted inappropriately towards women, or has engaged in a pattern or**

**practice of sexual harassment, inappropriate sexual touching, or sexual abuse, or that UHRP has allowed or condoned an environment that is hostile towards women."**

21. On or around April 29, 2024, the Report was delivered to Omer Kanat, UHRP's Executive Director, and Louisa Greve, UHRP's Director of Global Advocacy.  The next day, the report was shared with the Board Members, including Mr. Turkel.  Representing the Board, Dr. Justine Rudelson, then vice chair, *notified Mr. Turkel that the investigation cleared him of wrongdoing*.

22. Unfortunately, however, on May 10, 2024, the disproven allegations against Mr. Turkel were discussed in an article published by the nonprofit news organization NOTUS.  Although NOTUS accurately reported the conclusion of the Report—that there was no credible evidence to support any of the allegations that Mr. Turkel acted inappropriately toward women—Mr. Turkel realized that the continued attention being paid to these false accusations could distract from UHRP's mission.

23. So, despite being exonerated by the independent investigation, Mr. Turkel put UHRP's mission above his own self-interest and voluntarily resigned from his position on May 15, 2024. Mr. Turkel's objective in doing so was to protect the organization from unfair criticism, false allegations, and social media attacks that would drain the organization's time, energy, and resources.  In his resignation letter to UHRP, Mr. Turkel wrote: "This decision comes after careful consideration, as recent public disclosure surrounding allegations made against me and UHRP have necessitated this step to preserve the critical and life-saving work of the UHRP mission.  I believe it is in the best interests of the UHRP that nothing should distract from this cause or the dedicated work of its staff."

24. Two days after Mr. Turkel's formal resignation, on May 17, 2024, UHRP published on its website a statement titled, "UHRP Change of Leadership and Statement on Sexual Harassment" (the "May 17 Statement").  The May 17 Statement is attached hereto as Exhibit 1.  This statement was also posted, in its entirety, on UHRP's various social media platforms, including Facebook, LinkedIn, and X (formerly Twitter), in English and Chinese.

25. The first two sentences of the May 17 Statement read: "The Uyghur Human Rights Project (UHRP) announces the election of former Vice Chair, Dr. Justinian Rudelson Ben-Adam, as the new Board Chair of UHRP.  The board has accepted the resignation of Nury Turkel, the previous Chair."

26. The sentences immediately following then took an abrupt turn, completely reshaping the message to clearly imply that Mr. Turkel had committed sexual harassment.  The Statement continued: "UHRP has no tolerance for sexual harassment and is firmly committed to high ethical standards.  UHRP is committed to ensuring a welcoming environment for women and all activists in the movement for Uyghur human rights."

27. The May 17 Statement further stated that UHRP will be "taking a number of concrete steps going forward to address gender-based violence […] in the workplace […]," wrongly implying that Mr. Turkel had committed violence against women, despite (1) Mr. Turkel's exoneration, and (2) the fact that, indeed, none of the allegations against Mr. Turkel had even involved any supposed "violence."

28. The May 17 Statement was false and defamatory in its discussion of Mr. Turkel and it portrayed him in a false light in several ways.  The headline itself implied that UHRP's change in leadership was directly related to sexual harassment committed by prior leadership—namely Mr. Turkel—which UHRP knew was untrue.

7

29. The May 17 Statement also tethered Mr. Turkel's resignation to the (resolved and disproven) sexual harassment allegations against him by juxtaposing Mr. Turkel's resignation with stern language about zero tolerance for sexual harassment, all despite Isler Dare's conclusion that there was "simply no basis to support [the] assertion" that Mr. Turkel had engaged in sexually inappropriate acts.

30. The May 17 Statement was intended to, and did, give life to false rumors that Mr. Turkel resigned because he had committed sexual harassment, despite UHRP's knowledge there was no basis for the assertions made against Mr. Turkel.

31. By juxtaposing the announcement of Mr. Turkel's resignation with a disclaimer about zero tolerance for sexual harassment, the May 17 Statement drew by implication a false connection between Mr. Turkel's decision to step away and the disproven allegations of sexual harassment.

32. Moreover, while the May 17 Statement states that UHRP "hired a reputable and experienced law firm" to "conduct a thorough investigation," it inexplicably *makes no mention* of the fact that the investigation had been completed and, critically, *had cleared Mr. Turkel of any wrongdoing*. By omitting this critical detail, the May 17 Statement gives credence to the false allegations against Mr. Turkel.

33. Instead, UHRP stated, "We acknowledge the seriousness of the allegations brought to our attention," with no mention that Isler Dare's inquiry had already, by that date, determined the allegations to be unsupported by any "credible factual testimony." These intentionally misleading omissions demonstrate that UHRP's defamatory statements were made with malice and intent to harm Mr. Turkel.

**B. Mr. Turkel Has Suffered, and Continues to Suffer, Harm as a Result of UHRP's Defamatory Publications**

34. Mr. Turkel has suffered severe harm because of the defamatory, reckless, and negligent May 17 Statement.

35. UHRP's May 17 Statement has been amplified by international media outlets. For example, on May 20, 2024, *Radio Free Asia* published on its website an article titled "Uyghur Rights Activist Resigns Amid Sexual Harassment Claims," which also implies that Mr. Turkel was forced out as UHRP's Board Chair because he had committed sexual harassment. The *Radio Free Asia* article cites the May 17 Statement in support of these claims, and, like UHRP's statement, *Radio Free Asia* omits the critical information that the Isler Dare investigation cleared Mr. Turkel of any wrongdoing.

36. The *Radio Free Asia* article is highly visible in a Google search of Mr. Turkel and is cited in his Wikipedia bio. It amplifies the false and defamatory narrative stemming from the May 17 Statement, which has effectively spread the false allegations on a global scale, causing Mr. Turkel irreparable harm to his well-earned reputation through two decades of personal and professional sacrifice.

37. UHRP's social media postings invited countless ugly attacks against Mr. Turkel, causing irreparable damage to his dignity, reputation within the human rights community, and professional standing.

38. On or about June 4, 2024, the Carnegie Corporation, citing to the May 17 Statement, notified Mr. Turkel that it was postponing Mr. Turkel's Great American, Great Immigrant award that was scheduled to be announced on June 27, 2024. With no future date for the announcement set, the Carnegie Corporation's postponement is effectively indefinite—the Corporation has not responded to Mr. Turkel's request that they review the Isler Dare Report exonerating him of the

9

accusations, and has not responded to Mr. Turkel's offer to put the Corporation in contact with UHRP management. The professional and personal rewards this announcement would have generated—book sales, paid speaking engagements, media appearances for Mr. Turkel, and positive attention to the Uyghur-rights movement, generally—have evaporated as a result of UHRP's May 17 Statement.

39. On or about July 2, 2024, Mr. Turkel was disinvited from a paid speaking engagement before the New Mexico Bar Association. Upon information and belief, the New Mexico Bar Association had learned of the allegations of sexual harassment against Mr. Turkel from UHRP's May 17 Statement. This disinvitation resulted in the loss of $10,000 in speaking fees, caused by UHRP's defamatory publications.

40. The reputational and economic harm caused by the May 17 Statement persists to this day. On or about June 10, 2024, the National Endowment for Democracy, an organization that had entrusted Mr. Turkel with financial support when he first started UHRP, and with whom he had maintained an excellent relationship for 20 years, disinvited Mr. Turkel from the 2024 Democracy Award ceremony.

41. On or around August 29, 2024, the Forum 2000, an international conference of thought leaders, academics, and politicians who gather to discuss pressing global challenges, canceled Mr. Turkel's participation at the forum's annual conference in Prague, scheduled for October 2024. Mr. Turkel had spoken at previous years' conferences, including in 2023, when he shared a stage with influential global leaders such as the President of the Czech Parliament. But because of the adverse publicity resulting from the May 17 Statement, his invitation to the 2024 meeting was rescinded.

42. The false and defamatory May 17 Statement has also harmed Mr. Turkel's career and future employment prospects.

### C. Mr. Turkel and UHRP Reach a Contractual Agreement to Redress the Defamatory May 17 Statement

43. Beginning in or around July 2024, Mr. Turkel, through counsel, demanded that UHRP take remedial action, including the removal of all of the defamatory publications from UHRP's website and social media.

44. UHRP maintains an email listserv with a large subscription of people from governmental, legal, media, academic, think tank, and NGO communities in the U.S. and worldwide. The UHRP regularly shares news, events, and research reports relating to the Uyghur human rights campaigns. On numerous occasions, UHRP circulated news alerts and updates on Mr. Turkel's work, advocacy, and recognition on this listserv. This listserv contains a large number of Mr. Turkel's professional colleagues and persons with whom he works in the human rights community. His reputation among this specific group of people is of critical importance.

45. Therefore, in addition to demanding that UHRP remove the offending publications, Mr. Turkel also demanded that UHRP issue a remedial statement to its listserv acknowledging that the May 17 Statement may have caused misunderstandings about the reasons for his resignation as Board Chair.

46. Mr. Turkel explained to UHRP that unless it agreed both to remove the defamatory May 17 Statement from its website and social media accounts *and* to send a remedial statement to the listserv, he would be forced to bring a defamation suit against UHRP to clear his name and defend his personal and professional reputation.

47. On July 22, 2024, the parties executed a settlement agreement titled "General Release." (Hereinafter, "Release" or "Agreement") (Exhibit 2).  The Effective Date of the Agreement is the date it was signed and executed by all parties—July 22, 2024.

48. Paragraph 8 of the Agreement specifies that it will be governed by the laws of the District of Columbia without regard to its principles of conflict of laws.

49. Paragraph 3 of the Agreement states:

> In exchange for Mr. Turkel's release of claims described further below, UHRP agrees to do both of the following no more than one business day after the Effective Date: (a) remove the May 17, 2024 statement entitled "UHRP Change of Leadership and Statement on Sexual Harassment" ("May 17 Statement") from its website and all social media and (b) circulate the following language on its listserv:
>
> *"Uyghur Human Rights Project ("UHRP") Board Chair and co-founder Nury Turkel resigned on May 15, 2024. UHRP published a statement on May 17, 2024, which we have since removed from our website as it may have led to misunderstandings about the reasons for his departure. We thank Mr. Turkel for his more than a decade of volunteer service to UHRP and hope he continues his advocacy work for the Uyghur people."*

50. Paragraph 4 of the Agreement states that, "[i]n exchange for the consideration set forth in this Agreement," namely, the remedial actions specified above, Mr. Turkel would release his legal claims against UHRP, including, without limitation, defamation.  As described below, Mr. Turkel never received the consideration specified in the Agreement.

**D.  UHRP Willfully Breaches Its Agreement With Mr. Turkel**

51. Pursuant to the plain language of the Agreement, UHRP was obligated to complete all the remedial acts in Paragraph 3 no more than one business day after the Effective Date, or July 23, 2024.  It failed to do so.

52. On or around July 16, 2024, UHRP removed the May 17 Statement from its website. However, the content of the May 17 Statement remained on one or more of UHRP's social media accounts until approximately July 29.

53. Critically, UHRP *never* sent the remedial message to its listserv as required by Paragraph 3(b) of the Agreement.

54. In a further breach of the Agreement and causing further damage to Mr. Turkel, on or around August 6, 2024, UHRP doubled down and *reposted* the contents of the May 17 Statement on its website. The only change made was to divide the original message into two separate statements, both of which still reflect the original May 17 publication date.

55. On August 15, 2024, UHRP notified Mr. Turkel, through counsel, that UHRP did not intend to honor its obligation in Paragraph 3 of the Agreement to post the agreed-upon language to its listserv. Instead, UHRP deliberately chose to ignore its contractual obligations to Mr. Turkel and continue defaming him.

56. In short, UHRP utterly failed to comply with its obligations under Paragraph 3 of the Agreement.

**FIRST CAUSE OF ACTION:**
*Rescission of Contract*

57. Mr. Turkel incorporates and realleges paragraphs 1 through 56 as if fully set forth herein.

58. Mr. Turkel and UHRP entered into a written contractual agreement titled "General Release" on July 22, 2024.

59. As set forth above, the terms of the Agreement required UHRP to take the following actions within one business day after the effective date of the agreement in exchange for a release of claims from Mr. Turkel:

   a. Remove the May 17, 2024, statement entitled "UHRP Change of Leadership and Statement on Sexual Harassment" from its website and all social media; and

   b. Circulate agreed-upon remedial language in Paragraph 3(b) on its listserv.

60. Mr. Turkel was induced to release his claims against UHRP, including defamation claims, by UHRP's material misrepresentations that it would remove the May 17 Statement from its website and all social medial and circulate the remedial language to the listserv.

61. As alleged above, UHRP breached the terms of the Agreement by failing to remove the May 17 Statement from its website and social media pages in the timeframe specified in the Agreement, republishing the contents of the May 17 Statement on August 6, 2024, and by failing to issue the agreed-upon statement to its listserv as specified in the Agreement.

62. As described above, on or about August 15, 2024, UHRP, through counsel, informed Mr. Turkel of its unqualified refusal to honor the terms of the Agreement, asserting instead an intention to not be bound by, or perform its obligations under the Agreement.

63. UHRP did not deny that it had failed to perform its obligations under the Agreement. Indeed, it confirmed that it would never do so.

64. As a result of UHRP's unqualified refusal to honor its obligations under the Agreement, Mr. Turkel is entitled to rescission of the Agreement, and, accordingly, a declaration that his release of claims against UHRP is null and void.

### SECOND CAUSE OF ACTION:
### *Breach of Contract*

65. Mr. Turkel incorporates and realleges paragraphs 1 through 64 as if fully set forth herein.

66. Mr. Turkel and UHRP entered into a written contractual agreement titled "General Release" on July 22, 2024.

67. As set forth above, the terms of the Agreement required UHRP to take the following actions within one business day after the effective date of the agreement in exchange for a release of claims from Mr. Turkel:

    a. Remove the May 17, 2024, statement entitled "UHRP Change of Leadership and Statement on Sexual Harassment" from its website and all social media; and

    b. Circulate agreed-upon remedial language in Paragraph 3(b) on its listserv.

68. UHRP breached the contract by failing to remove the May 17 Statement from its social media pages within the agreed-upon timeframe.

69. UHRP further breached the contract by republishing the contents of the May 17 Statement on its website on or around August 6, 2024.

70. UHRP further breached the contract by failing to circulate the agreed-upon remedial language in Paragraph 3(b) on its listserv.

71. UHRP's breach is without legal justification.

72. UHRP has been aware of its breach since at least July 24, 2024, and has remained in breach despite repeated demands from Mr. Turkel, through counsel, that UHRP honor its contractual commitments.

73. As a direct and proximate result of UHRP's breach of contract, Mr. Turkel has suffered and continues to suffer damages in an amount to be determined at trial, including but not limited to the loss of speaking engagements and awards, reputational harm, diminished community standing, harm to future employment prospects, and mental and emotional distress.

## THIRD CAUSE OF ACTION
*Defamation—The May 17, 2024, Statement*

74. Mr. Turkel incorporates and realleges paragraphs 1 through 73 as if fully set forth herein.

75. Defendant UHRP issued, published, or caused to be published on its website and social media accounts the May 17 Statement, which contained false, misleading, and defamatory statements of fact concerning Mr. Turkel.

76. The false, misleading, and defamatory statements carry the unmistakable message that Mr. Turkel's tenure at UHRP ended because he engaged in sexual harassment while serving as the Chair of UHRP's Board of Directors.

77. Any reasonable individual who read or otherwise received UHRP's May 17 Statement and social media posts would have understood and attributed the defamatory meaning that UHRP intended to convey.

78. UHRP knew, or had reason to know, that its false statements about Mr. Turkel would be widely disseminated in the human rights advocacy community and news media.

79. When it made the defamatory statements, Defendant UHRP knew that there was no basis to support the allegations that Mr. Turkel had engaged in sexual impropriety but juxtaposed news of his resignation with statements about sexual harassment to wrongly imply otherwise.

80. UHRP failed to act with ordinary care to avoid the publication of false, misleading, and defamatory statements concerning Mr. Turkel, and its statements and social media posts were published with negligent disregard for the truth, at minimum.

81. UHRP also acted with actual malice and/or acted with reckless disregard for the truth when it knowingly and intentionally published statements tethering Mr. Turkel's resignation to disproven allegations of sexual misconduct.

82. UHRP's defamatory statements about Mr. Turkel were not privileged.

83. UHRP's defamatory statements about Mr. Turkel were distributed to third parties and republished by others in and outside of the District of Columbia, misleading thousands of people and permanently impugning Mr. Turkel's reputation in the human rights community and his social circles, subjecting him to humiliation, mental anguish, ridicule, and disgrace.

84. As a direct and proximate cause of UHRP's defamatory actions and omissions,

Mr. Turkel has suffered and continues to suffer general damages in an amount to be determined at trial, including but not limited to the loss of speaking engagements and awards, reputational harm, diminished community standing, harm to future employment prospects, and mental and emotional distress.

85. As a direct and proximate cause of UHRP's defamatory actions and omissions, Mr. Turkel also has suffered special damages of $10,000 resulting from the loss of the speaking engagement before the New Mexico Bar Association.

## FOURTH CAUSE OF ACTION
*Defamation—The August 6, 2024, Republication of the May 17 Statement*

86. Mr. Turkel incorporates and realleges paragraphs 1 through 85 as if fully set forth herein.

87. As described above, on or around August 6, 2024, UHRP republished the May 17 Statement in two parts, again juxtaposing news of Mr. Turkel's resignation with a statement about UHRP's zero tolerance for sexual harassment. (Together, the "August 6 Statement" or "Republished May 17 Statement"; Exhibit 3).  The first part is titled "UHRP Change of Leadership" and the second part is titled "UHRP Statement on Sexual Harassment."  Both parts are dated May 17, 2024, relating back to the date of the original May 17 Statement.

88. The titles for the two parts of the Republished May 17 Statement are displayed adjacent to one another on UHRP's website using identical graphics, which further ties them together, as shown below and in Exhibit 4:



89. As with the May 17 Statement, UHRP acted with actual malice and/or acted with reckless disregard for the truth when it knowingly and intentionally published unprivileged statements tethering Mr. Turkel's resignation to disproven allegations of sexual misconduct.

90. Indeed, the portion of the May 17 Statement republished on August 6 under the title "UHRP Statement on Sexual Harassment" still expressly directs readers' attention to Mr. Turkel's resignation, stating (italics in original), "*Note: This UHRP Statement on Sexual Harassment was originally posted on May 17 as part of a two-part statement also announcing a change in board leadership.*"  Exhibit 3.

91. Any reasonable individual who read or otherwise received UHRP's August 6 Statement would have understood UHRP's intent to conflate Mr. Turkel's resignation with false claims of sexual harassment and violence against women, despite (1) Mr. Turkel's exoneration by the Isler Dare Report, and (2) the fact that none of the allegations against Mr. Turkel concerned "gender-based violence."

92. As with the May 17 Statement, UHRP knew, or had reason to know that its defamatory juxtaposition of news of Mr. Turkel's resignation with foreboding language about investigating "gender-based violence and "harassment in the workplace," in the August 6 Statement would spread throughout the human rights advocacy community and news media.

93. UHRP's posting of a "Statement on Sexual Harassment" immediately adjacent to news of Mr. Turkel's resignation further demonstrates a failure to act with ordinary care to avoid the publication of false, misleading, and defamatory statements, or disregard for the truth.

94. As with the May 17 Statement, UHRP's August 6 Statement also evidences actual malice and/or reckless disregard for the truth by knowingly and intentionally tethering Mr. Turkel's resignation to disproven allegations of sexual misconduct.

95. As a direct and proximate cause of UHRP's defamatory actions and omissions, Mr. Turkel has suffered and continues to suffer humiliation, mental anguish, ridicule, and disgrace.

96. As a direct and proximate cause of UHRP's defamatory actions and omissions, Mr. Turkel has suffered and continues to suffer general damages in an amount to be determined at trial, including but not limited to the loss of speaking engagement and awards, reputational harm, diminished community standing, harm to future employment prospects, and mental and emotional distress.

## **RELIEF REQUESTED**

WHEREFORE, as to all claims, Mr. Turkel seeks judgment against UHRP as follows:

1. That the Court permanently enjoin the Defendant from further defaming Mr. Turkel;

2. That the Court rescind the General Release Agreement;

3. That the Court award Mr. Turkel compensatory damages in an amount to be determined at trial, but in no event less than $1,000,000 (including lost past and future compensation, lost earning potential, and compensation for his humiliation, embarrassment, and emotional distress);

4. That the Court award Mr. Turkel special damages in an amount of $10,000;

5. That the Court award Mr. Turkel punitive damages to punish and penalize UHRP and deter it from repeating its unlawful conduct;

6. That the Court award Mr. Turkel all fees and costs incurred in the prosecution of these claims;

7. That the Court grant such other and further relief as the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands a trial by jury.

Dated: October 1, 2024                                   Respectfully submitted,

*/s/ Courtney R. Forrest*
Courtney R. Forrest (D.C. Bar No. 996740)
Noah Brozinsky (D.C. Bar No. 1655789)
KAISER PLLC
1099 14th Street, N.W., 8th Floor West
Washington, D.C. 20005
Tel: (202) 640-2850
cforrest@kaiserlaw.com
nbrozinsky@kaiserlaw.com

*Attorneys for Plaintiff Nury Turkel*